## JACK T. GRIFFIN *v.* WILLIAM MIXON.

1. CONSTITUTIONAL LAW : FORFEITURE OF LANDS FOR NON-PAYMENT OF TAXES UN-CONSTITUTIONAL.—So much of the Act of 9th March, 1850 (Session Laws, ch. 2, p. 50), as provides for a forfeiture of land to the State, on the failure of the owner to pay the taxes due thereon, is in violation of the 13th section of the Bill of Rights, which prohibits the taking of private property for public use, without a "just compensation being first made therefor:" and also of the 10th section, which declares that a citizen shall not be "deprived of his life, liberty, or property, but by due course of law;" and said act is therefore null and void. HANDY, J., dissented.

2. SAME.—The general principles regulating the exercise of the taxing power discussed, and the authorities cited and reviewed, by Justice Harris delivering the opinion of the court, and by Justice Handy dissenting.

ERROR to the Circuit Court of Chickasaw county.   Hon. William Cothran, judge.

This was an action of ejectment, commenced under the Pleading Act of 1850, to recover a quarter section of land, situated in Chickasaw county.   The defendant pleaded a general denial, and set up a claim for improvements made by him on the land.

The plaintiff claimed title under a deed from the State of Mississippi, which conveyed the title of the State, acquired by a forfeiture of the *locus in quo* for non-payment of taxes, under the provisions of the Act of 1850.   In support of his title, the plaintiff read in evidence a deed from the auditor of public accounts to one Black, conveying the premises as forfeited land; and a deed from Black, conveying the premises to him.   The defendant objected to

the reading in evidence of the deed from the auditor of public accounts, upon the ground that the Act of 1850, in pursuance of which said deed was made, was unconstitutional. This objection was overruled, and the defendant excepted.

The plaintiff then offered in evidence a certificate of the auditor of public accounts, which stated in substance that the tax-collector of Chickasaw county did, on the 1st Monday of April, A. D. 1851, return to the board of police of said county, a list of all the land and town lots within said county, which were delinquent for the non-payment of taxes due thereon, in the same numerical order as the same stands on the land assessment-roll, for that year, which list was made out in the form the law directs. That at the foot of the return so made, appears the oath of the tax-collector, distinctly setting forth, that after diligent inquiry he could not find personal property liable to distress for such taxes; which oath appears to have been made according to the second section of the Revenue Act, approved March 9th, 1850. That it appears from the record of his office, that a copy of said list, so returned, was certified by the probate clerk of said county, and returned, as the law directs, to the auditor of public accounts; and that said list and verification, when so filed, were by the auditor duly recorded in a book kept by him for that purpose, and that in said list of delinquent and forfeited lands was included the land in controversy in this suit.

The defendant objected to the reading of this certificate, upon the ground that it was insufficient in law; which objection was sustained, and the plaintiff excepted. Thereupon the plaintiff offered in evidence, in connection with said certificate, the records of the police court of Chickasaw county, showing that, on the second Monday in April, 1851, said court had directed the probate clerk to certify to the auditor of public accounts an exact copy of the list of lands and town lots delinquent for the non-payment of taxes for the year 1851. Upon objection by defendant, this record was excluded from the jury, and the plaintiff excepted.

The provisions of the Act of the 9th of March, 1850 (Session Laws, 50–56), so far as they relate to the questions involved in this case, are in substance as follows:

Section 1. No land shall hereafter be exposed to sale for taxes

due thereon, but the taxes shall be collected by distress and sale of any personal property of the owner.

Section 2. It is provided that on the first Monday in April in each year, the tax collector of every county shall return to the board of police of his county a list of the lands and lots within the county which are delinquent for non-payment of taxes thereon, in the same numerical and consecutive order as they appear on the assessment-roll, and at the foot of the return he shall make oath to the effect that the lands so returned are delinquent, and that after diligent inquiry, he has found no personal property liable to distress for the same.

Section 3. That on the second Monday in April, the board of police shall examine said list, and shall order the clerk of the Probate Court to certify a literal and exact copy of the same within ten days after such examination, and to post a like copy at the door of the court-house.

Section 4. That the list and verification when filed in the auditor's office, shall be entered by him on a record kept for that purpose, " and shall vest a title to the lands and lots therein returned in the State of Mississippi, which shall be impeachable only on proof, that the taxes for non-payment whereof the said lands were returned forfeited, had been in fact paid to the collector before the return of the list by him to the board of police ; and that in all controversies which may arise touching the delinquency and forfeiture of such land, the certificate of the auditor under his seal of office shall be taken and held as evidence of the same, liable to be rebutted only by proof of such payment to the collector."

Sections 5, 6, 7. It is provided that the tax-collector shall give each tax-payer a receipt, specifying particularly the property on which the tax is paid; and that upon the production to the auditor of such a receipt bearing date prior to the forfeiture, the auditor shall return by quitclaim the interest of the State in the land mentioned in the receipt, and shall charge the collector with taxes on the same. And that within two years from the forfeiture, any person interested in land forfeited, may redeem the same.

By the Act of 16th March, 1852, the time for the redemption of forfeited lands was extended to the first Monday in April, 1853, and thereafter lands unredeemed are directed to be sold by the auditor.

The defendant had verdict and judgment, and the plaintiff sued out this writ of error; and it was agreed that this court should decide all the questions raised by bills of exceptions of both parties.

*W. F. Dowd,* for plaintiff in error.

I. It is difficult to imagine on what principle or for what reason the auditor's certificate and the records of the police court were excluded from the jury. The Act of 1850 (see Pamphlet Acts, p. 52), sec. 4, provides, that in all controversies touching the delinquency and forfeiture of such lands, the certificate of the auditor shall be filed and taken as evidence of the same.

To obtain a copy of the record of the auditor's office, containing a list of all the delinquent lands in the county or State, would be impracticable. Besides, the original list returned would be the best evidence, and would have to be produced on the trial of each case. This would be impossible. The legislature, therefore, wisely provided that a certificate of the auditor should be evidence of the forfeiture and delinquency.

It has been questioned by high authority whether the legislature could make this certificate conclusive evidence of forfeiture. This grave question is not involved in the present issue.

All that we ask is, that the certificate of the auditor, stating all the facts in reference to the delinquency and forfeiture of the land in dispute, as they appear of record, shall be received as *prima facie* evidence. Without these facts appearing of record in the auditor's office and the police court, we could not possibly prove that the law had been in all respects complied with.

The copies of deeds and wills are mere certificates of the officers of what appears on the record, and these are made evidence of these solemn and important instruments. The power of the legislature to pass such a law is upheld and sustained in the following cases. *Pillow* v. *Roberts,* 13 Howard U. S. Reports, 472; *Steadman* v. *Planters' Bank,* 2 Eng. Ark. Rep. 424, 428.

In *Hopkins* v. *Soudridge,* which contains a judicial construction of the act under consideration, it was conceded by counsel that it was competent for the legislature to make the certificate *prima facie* evidence of delinquency and forfeiture. 2 George, 31 Miss. 673.

We do not even ask this much. We only want the certificate

admitted as evidence of the facts appearing on its face. *Gwynne* v. *Neiswanger*, 18 Ohio R. 400.

II. It is insisted that the act of the legislature was unconstitutional and void. It is now too late to question the power of the legislature to pass laws to enforce the collection of the revenues of the State, and for this purpose to deprive the citizen of his property by *ex parte* proceedings. This power is founded in necessity and consecrated by time. The great principles of liberty in the British Constitution, embodied in Magna Charta, are not more venerable, nor have they oftener received the sanction of our most enlightened tribunals.

There is no difference in principle between the Act of 1850, declaring lands forfeited to the State on the non-payment of taxes, after certain proceedings by its ministerial officers, and other acts ordering a public sale of the land. Both are *ex parte* proceedings, and in neither case is the citizen deprived of his property " by the judgment of his peers or the law of the land," according to the construction placed by counsel on those celebrated words in Magna Charta, and embraced in many of the State constitutions.

Out of a multitude of cases, I refer the court to the following, which conclusively settle the proposition under consideration. *Parham* v. *Decatur County*, 9 Georgia R. 352; *McCarroll* v. *Weeks*, 5 Haywood R. 246; *Harris* v. *Wood*, 6 Monroe (Kentucky R.), 643; *Livingston* v. *Moon*, 7 Peters R. 669.

*T. S. Evans*, on same side.

*Featherston* and *Orr*, for defendant in error.

1. The certificate of the auditor was properly excluded. It does not contain a list of the lands and town lots within the county of Chickasaw, which were delinquent for the non-payment of the taxes for the year 1850, nor does it contain a copy of the collector's certificate to the board of police, that he could not find personal property out of which to make the taxes. It does not contain a copy of the oath made by the collector; nor does it contain a copy of the order passed by the board of police, directing the clerk of the Probate Court to certify an exact copy of the return made by the collector to the board of police, to the auditor of public accounts, within ten

days. The second section of the Act of 1850 provides, that all these acts shall be performed before the title to the land can vest in the State. How could the Circuit Court of Chickasaw county learn whether these requirements of the law had been complied with? From the record in the auditor's office, of course, because the law required them to be placed upon that record. That record must speak for itself, and show upon its face that these acts were done. The auditor should have given a true and perfect transcript of the record, with a certificate of its correctness. These things should have been set out in the auditor's certificate, to enable the court to judge of their sufficiency. It was certainly the province of the court to decide whether the collector had complied with the requirements of the law in making his return, in his oath, certificate, &c.; and so it was the province of the court to decide how, and in what manner the police court and probate clerk had discharged their duty.

How could this be decided by the court, unless the acts of these officers appear in the auditor's certificate? To maintain a different doctrine, would vest in the auditor of public accounts, a mere ministerial officer, a very important judicial power,—that of deciding upon the legality and regularity of all the proceedings by which lands are forfeited for the non-payment of taxes, under the Act of 1850; we would become a court of last resort, clothed with the power of deciding the title to real estate, amounting to millions of dollars. To permit the auditor to certify merely, that the collector and other officers charged with the duty of collecting the taxes and selling the lands, had performed their respective duties, without stating the mode or manner in which they were done, would place it in the power of the auditor to give a false certificate, when there is no power in existence by which he could be reached. The auditor assumes that all of the requirements of the statute have been complied with, and gives a general certificate to that effect. This is not such a certificate as the fourth section of the Act of 1850 contemplates, but one setting forth the acts of the different officers in *hæc verba* is required.

To make out a *prima facie* case, it devolved upon the plaintiff to show that the conditions precedent to the vesting of the title in the State had been complied with. Under the revenue law of 1844,

the tax-collector's deed made out the *prima facie* case; but under the law of 1850, the auditor's certificate makes out the *prima facie* case for the claimant through his tax title, when properly made out. We rely upon the following authorities to sustain the points made above. " He who claims under a tax title, must show affirmatively that all the prerequisites required by law have been complied with by those officers who are charged with the execution of the revenue laws." Blackwell on Tax Titles, 84, 94. " It is a condition precedent to the passing of title at tax sales, that the proceedings of the officers who have anything to do with the listing and valuation of the lands, the levy and collection of the tax, the return, filing, or record of the proceedings, must be in strict compliance with the statute." Blackwell on Tax Titles, 46, 79. In the case of *Doe* v. *The Natchez Insurance Company*, 8 S. & M. 209, Judge Sharkey said: " We admit the doctrine decided in the case referred to (4 Wheaton, 79), that a sale made under a naked power, derived from a statute, uncoupled with an interest, will be void, if the statute is not strictly pursued; and if the validity of a deed made under such a sale, depends upon a matter *in pais*, the party claiming under it is bound to prove performance of the act." This doctrine is sustained by an unbroken current of authorities. Nor could the plaintiff aid the record by proof *aliunde*. The record must speak for itself, and could not be assisted by parol proof. See Blackwell on Tax Titles, 93, 291. This certificate was the medium of proof, and the only medium, established by the act of the legislature of 1850. See Acts of 1850, p. 50. It was fatally defective, and properly excluded by the circuit judge from the jury.

But we insist, that the act of the legislature of 1850 is unconstitutional and void, and that the court erred in permitting the deed from the State to W. W. Black to be read to the jury. The language of that act is, in substance, " unless the citizen pays the pittance of taxes due the State within the time prescribed, his land shall be forfeited to the State."

If the tax be not paid, the State assumes that the land is worth no more than the amount of the tax assessed; and in the exercise of a despotic power which would have made a Federalist blush, appropriates to its own use a tract of land worth ten thousand

dollars, when its demand for taxes did not exceed five dollars. It is the boast of the citizen in this country, that his government is the guardian, the protector, and not the despoiler and destroyer of his property. The framers of our State and Federal Constitutions seem to have learned enough of the forfeiture of private property to despotic governments in time past, to guard against it in the organic law of this country. It seems strange that, in view of these checks and balances, the legislature of the State of Mississippi should have passed the Act of 1850.

We rely upon the following provisions of the Constitution, with which the Act of 1850, we think, comes directly in conflict:

The tenth section of the Bill of Rights (Constitution of Mississippi) declares, that " no citizen can be deprived of his life, liberty, or property, but by due course of law." The fifth amendment to the Constitution of the United States declares, that " no person shall be deprived of his life, liberty, or property, without due process of law." Under the Act of 1850, the citizen is deprived of his property, not by due course of law, not by due process of law, but by the mere act of a ministerial officer, the sheriff of the county in which the land may lie. It is not done by the decision of a court of justice, not by the verdict of a jury, not by an inquest of office, or in any mode known to the common law, but by the act of an officer who is clothed with no judicial powers. To maintain such a doctrine is to abolish the distinctions established, by the framers of the Constitution, between the different departments of the government. It is to deprive the judiciary of the right of expounding the law, and to confer that right upon a mere executive officer of an inferior grade. What was intended by the framers of the Constitution by the use of the terms, " due course of law," "without due process of law"? They were evidently used not without a meaning, not without an object. The same terms are to be found both in the State and Federal Constitutions. The object was, doubtless, to throw additional safeguards around the rights of the citizen, to place his life, liberty, and property under the protection of the judicial department of the government, and not to leave it to the caprice of an ignorant or corrupt ministerial functionary. The terms here employed have, by judicial interpretation, received a well-defined meaning. In the case of *Carpenter* v. *The State*, 4

How. 163, the court said: "It is a general rule, that when terms used in the common law are contained in a statute, or the Constitution, without an explanation of the sense in which they are there employed, they should receive the construction which has been affixed to them by the former." See also 2 Peters's Dig. 618, 621, 622; *Flournoy* v. *Smith,* 3 How. 62; *Thompson* v. *The Grand Gulf R. R. and Banking Company,* 3 Ib. 240. These terms are, therefore, to be understood as used at common law, having been transferred to the Constitution without explanation. Can it be seriously insisted, then, that at common law the language, "by due course of law," and "without due process of law," could mean anything but some regular judicial proceeding,—a proceeding in which process was employed, the parties heard, and the action of a court invoked? If the legislature can dispense with process in this class of cases, dispense with the judicial department of the government, and deprive the citizen of his property without his being heard, by the mere act of an inferior officer, why can the same thing not be done in all other cases? Life, liberty, and property are classed under the same broad and inflexible provision in the declaration of rights. If this law be constitutional, why can the legislature not, by gradual encroachments or by one daring usurpation, overthrow the judiciary and transfer its powers to the sheriffs of the different counties in the State, as in this instance? It can make no difference, that the State is a party to this controversy, that the taxes due and collected are required to be paid into the treasury. The Constitution makes no distinction between the State and one of its citizens, when the citizen is to be deprived of his life, liberty, or property. See Blackwell on Tax Titles, 546.

Again, the nineteenth section of the declaration of rights declares, that "no conviction for any offence shall work corruption of blood or forfeiture of estate." Constitution of Mississippi.

This act, passed by a Mississippi legislature, provides, that a citizen of the State shall forfeit his estate, not for an offence committed, as was the case in the despotisms of the Old World, but for failing to discharge a simple duty in paying a small sum due to the State as a tax assessed upon his property. Blackstone says, in vol. 2, p. 212: "Lands, tenements, and hereditaments may be forfeited in various degrees, and by various means: by crimes and

misdemeanors, by alienation contrary to law, by non-representation to a benefice, by simony, by non-performance of conditions, by waste, by breach of copyhold customs, by bankruptcy." The legislature of Mississippi, in passing the Act of 1850, has gone far beyond the British government, and said, that in this land of liberty the citizen shall forfeit his lands, not for crimes committed by him, but simply for failing to discharge a duty in paying to the State a small debt due as a tax imposed. If the citizen cannot forfeit his estate here for crimes committed, surely the non-performance of a duty, imposed by law, cannot operate as a forfeiture. It was to prevent the enactment of such statutes as the Act of 1850, that this provision seems to have been placed in the Constitution. The thirteenth section of Declaration of Rights (Constitution of Mississippi) declares that, " nor shall any person's property be taken or applied to the public use without the consent of the legislature, and without just compensation being first made therefor." The same principle is to be found in the fifth amendment to the Constitution of the United States. Can it be said that cancelling a debt of ten dollars due the State for taxes from one of her citizens, is just compensation for a tract of land worth twenty thousand dollars?

And yet such is the operation of the Act of 1850. A tract of land worth ten or twenty thousand dollars is declared forfeited to the State, because its owner has failed to pay his taxes on it, amounting to the sum of five or ten dollars. And this is to be decided just compensation, in the language of the Constitution. This clause of the Constitution has been reviewed by this court in the case of *Thompson* v. *The Grand Gulf Railroad and Banking Company*, 3 Howard, 240; and we invoke the application of the sound rules of construction applied by the court to the act then under consideration, to the Act of 1850. We think the judgment of the court below should be affirmed.

HARRIS, J., delivered the opinion of the court.

The plaintiff brought his action of ejectment in the court below to recover a tract of land alleged to have been forfeited to the State under the Act of 1850, for the non-payment of taxes; and seeks to derive title under such forfeiture, by virtue of the Acts of

9th March, 1850, and the 16th March, 1852, and his purchase from the State.

The question involved is, whether the legislature had power, by *simple act of legislation,* to vest the title to lands, delinquent for non-payment of taxes, in the State of Mississippi.

Independent of written constitutions, as early as the seventeenth century it was said by Lord Coke, when Chief Justice of the King's Bench, in Dr. Bonham's case, " that the *common law* doth control acts of Parliament, and adjudges them void when against common right and reason." Lord Chief Justice Hobart, a few years after, in *Day* v. *Savage,* declared that an act of Parliament made against natural equity (as to make a man judge in his own case) was void; and Lord Chief Justice Holt is reported to have said, in relation to the declaration of Lord Coke, cited above, that it " was not extravagant, but was a very reasonable and true saying." *City of London* v. *Wood,* 12 Mod. 687, and 10 Mod. 118.

Ethical writers, as well as learned judges, of a much more modern date, are not wanting to enforce by their authority, as well as elucidate by their wisdom, these same doctrines of civil liberty which have been fully adopted into our written constitutions.

Such were the views of Mr. Justice Chase in *Calden* v. *Bull,* 3 Dallas Rep. 386. So Chief Justice Marshall, in *Fletcher* v. *Peck,* 6 Cranch, 87, declared, that " it may well be doubted whether the *nature of society and government* does not prescribe some limits to the legislative power; and if any be prescribed, where are they to be found, if the property of an individual, fairly and honestly acquired, may be seized without compensation ?"

" To the legislature, all legitimate power is granted; but the question whether the act of transferring the property of an individual to the public, be in the nature of legislative power, is well worthy of serious reflection."

And Justice Patterson, in 2 Dallas, 313, speaking of the appropriation of private property for public use by the legislature, uses this forcible and appropriate language : " The English history does not furnish an instance of the kind. The Parliament, with all their boasted omnipotence, never committed such an outrage on private property; and if they had, it would have served only to display the dangerous nature of unlimited authority; it would have been an

exercise of power and not of right. Such an act would be a monster in legislation, and shock all mankind. The legislature, therefore, had no authority to make an act divesting one citizen of his freehold, and vesting it in another without a just compensation" (nor even with it, except for *public* use, he afterwards adds). " It is inconsistent with the principles of reason, justice, and moral rectitude ; it is incompatible with the comfort, peace, and happiness of mankind. It is contrary to the principles of social alliance in every free government ; and lastly, it is contrary to both the letter and spirit of the Constitution." And again : " Omnipotence in legislation is despotism. According to this doctrine, we have nothing we can call our own, or are sure of, a moment. We are all tenants at will, and hold our landed estates and property at the mere pleasure of the legislature."

So in *The University of Maryland* v. *Williams*, 9 Gill. & J. 365, Chief Justice Buchanan says : " Independent of that instrument (the Constitution of the United States), and of any express instructions in the Constitution of the State, there is a fundamental principle of right and justice, inherent in the nature and spirit of the social compact (in this country at least), in the character and genius of our government,—the causes from which they spring, and the purposes for which they were established,—that rises above, and restrains, and sets bounds to the powers of legislation, which the legislature cannot pass without exceeding its rightful authority. It is that principle which protects the life, liberty, and property of the citizen from violation in the unjust exercise of legislative power.

" To say that the legislature possesses the power to pass capriciously, or at pleasure, a valid act, taking from one his property and giving it to another, would be in this age, and in this State, a startling proposition, to which the assent of none could be yielded."

The same doctrines are powerfully stated, and argued, by Mr. Justice Bronson, in *Taylor* v. *Porter*, 4 Hill N. Y. Rep. 146 ; by Tracy, Senator, in *Bloodgood* v. *The Mohawk and Hudson River Railroad Company*, 18 Wend. 56 ; and by Chancellor Walworth, in *Varick* v. *Smith*, 5 Paige R. 159.

And Mr. Justice Story, in *Wilkinson* v. *Leland*, 2 Peters, 654, delivering the opinion of the Supreme Court of the United States,

after an able argument by Mr. Webster, asserting these doctrines, said, " he held that, in a government professing to regard the great rights of personal liberty and of private property, and which like this was required to legislate in subordination to the general laws of England, it would not be presumed, slightly, that the general principles of Magna Charta were to be disregarded, or that the estates of its subjects were to be taken away without trial, without notice, and without offence. Even if such authority could be deemed to have been confided, by the charter of the General Assembly of Rhode Island, as an exercise of transcendental sovereignty, before the Revolution, it could scarcely be imagined that that great event could have left the people of that State subject to its uncontrolled and arbitrary exercise. He was of opinion, that that government could scarcely be deemed free, where the rights of property were solely dependent on the will of the legislature, without any restraint. The fundamental maxims of a free government seemed to require, that the rights of personal liberty and private property should be held sacred; at least, that no court of justice, in this country, could be warranted in assuming, that the power to violate and disregard them,—a power so repugnant to the common principles of justice and civil liberty,—lurked under any general grant of legislative authority, or ought to be implied, from any general expressions of the will of the people. The people ought not to be presumed to part with rights so vital to their security and well-being, without very strong and direct expressions of intention."

" We know of no case," he adds, " in which a legislative act, to transfer the property of A. to B., without his consent, has ever been held a constitutional exercise of legislative power, in any State in the Union. On the contrary, it has been constantly resisted, as inconsistent with just principles, by any political tribunal in which it has been attempted to be enforced. We are not prepared, therefore, to admit, that the people of Rhode Island have ever delegated to their legislature the power to divest the vested rights of property, and transfer them without the consent of the parties."

If upon *general principles*, the power of the legislature is thus restricted, how much more important is it under the guarded provisions of *our Constitution*, that we should scrutinize the act in question by which the land of this defendant, without notice,—

actual or constructive,—without his consent, without compensation, without necessity for public use, and without "*due course of law,*" is attempted to be wrested from him, and, for a nominal consideration, vested by the power of legislation alone in this plaintiff. It is not to be *presumed,* that such a power exists, in this State, at this day, under our Constitution.

It is for those who claim to derive a right, under a power so extraordinary, to inform us whence it is derived, and where it may be found; or in what moment of folly or infatuation, an intelligent people, desiring rational liberty, cautious of restraint, and zealous of power, have thus abandoned one of the cardinal rights for the protection of which free governments are instituted.

We are told, by counsel for appellant, that "it is now too late to question the power of the legislature to pass laws *to enforce the collection of the revenues of the State,* and for this purpose to deprive the citizen of his property, by *ex parte* proceedings." This we do not question; at least we do not question the power of the legislature to pass laws providing for the collection of taxes in the most summary manner, without the tedious formalities which ordinarily environ the private creditor, who seeks to do the same thing (collect his debt) "by due course of law." But in doing so, no private right, no constitutional provision, no great principle which lies at the foundation of our political system, need be, or must be violated.

That the legislature may provide for the assessment of taxes, and create officers,—executive and judicial,—in a summary manner to levy and collect taxes, nobody ever doubted. This has been practised, under our Constitution, without objection, since the organization of our State government. In doing so, the legislature creates *a court,* and provides for notice, where parties can be heard, judgment rendered, execution issued, and property sold, according to the just provisions of a known law,—organic as well as legislative. It is done without form, but when examined, there will be found in its hasty and informal character, all the essential elements of a court and its attendant officers, &c. No jury trial is specially provided for, nor is it necessary. Trial by jury, as known to our Constitution and known to the common law, was never employed, from its earliest history, in these summary proceedings; and hence

it "*remains inviolate*," as practised at the adoption of our Constitution. Such is the case cited from 6 Monroe, Ky. Rep. 643.

But that the legislature, without notice or demand,—upon the failure of the citizen to pay his taxes,—and without giving him the opportunity to show that he has paid them, may adjudge his lands forfeited to the State, and then transfer them to another, is a practice neither "derived from Magna Charta," nor known in this State, until the passage of the act in question. It is not, therefore, "founded in necessity;" as suggested: for the State had existed for more than a quarter of a century without its aid, under a written constitution, and the jealousy of the people's representatives allowed it but a temporary existence after its first inauguration here, in 1850, before it was repealed.

So far from it being true, as remarked by the able and ingenious counsel who employ it, that the power to appropriate a man's whole estate for default in the payment of a few dollars tax by a simple act of legislation, without more, "is founded in necessity and consecrated by time," Senator Tracy, in a case already cited, said truly: "It has never been allowed to be a rightful attribute of sovereignty in any government professing to be founded upon fixed laws, however despotic the form of government might be, to take the property of one individual, or subject, and bestow it upon another." And this is admitted in the case cited from 7 Peters, 669. This power, instead of being acknowledged, was expressly repudiated by the Roman law as the height of imperial despotism.

Even Hobbes, the most ingenious of all the advocates of despotic power, does not claim such a power: and no approved writer on public law will be found to go as far as Hobbes in vindicating the unqualified right of the sovereign to assume at will the property of the subject.

Under our Constitution, the *legislative*, the executive, and judicial departments of the State, *all* owe their existence to that instrument. Their powers are all derived from and limited by it. They can do nothing without its sanction; they can exercise no power not properly belonging to their respective departments.

Written constitutions are in every instance *limitations* upon the powers of government in the hands of agents; there never was a republican constitution which delegated to functionaries all the

latent powers of government which lie dormant in every nation: which are boundless in extent and incapable of definition.

Our Constitution, in its first breath, thus speaks the voice of a free people: "That the general, great, and essential principles of liberty and free government, may be recognized and established, WE DECLARE"—(that is, that there may be no dispute between government and citizen; that the great and essential rights of each individual member of this public compact may be " *established*" *thereby*, and " *recognized*" by their mutual agents and only depositaries of the general powers of government; *it is declared*, among other things), " that all political power is inherent in the people, and all free governments are founded on their authority, and established for their benefit."

For the purpose of more effectually guarding and protecting the personal liberty, and personal security, and private property of the citizen, specific limitations on the general powers of government thereby delegated are expressly provided in our Constitution. Among those designed to secure life and liberty may be mentioned the *equality of rights* secured by the 1st section to all freemen. The *sovereignty of the people*, and the subserviency of government to their interests and happiness, as declared in the 2d section. Religious toleration, secured by the 3d section and the 4th. Freedom of opinion, in the 5th, 6th, 7th, and 8th sections. Security from seizure, search, trial, or arrest, except according to law, and in the forms thereby prescribed, as provided in the 9th, 10th, 11th, and 12th sections. Protection against excessive bail and illegal detention, in the 16th, 17th, and 18th sections. The right to bear arms in defence of himself, or the State, in the 23d section.

And to secure inviolate the right of *private property* against invasion from the government thus established for protection, in an *especial manner* did the framers of our Constitution stipulate in that instrument:

1. Against the deprivation of " *life, liberty, or property, but by due course of law.*"

2. " Nor shall any person's *property be taken or applied* to public use, without the consent of the legislature, *and without just compensation being first made therefor.*"

3. " That all courts shall be open, and every person for an injury

done him in his *lands, goods,* person, or reputation, shall have remedy by *due course of law,* and right and justice administered without sale, denial, or delay."

4. "No conviction for any offence shall work corruption of blood, or *forfeiture of estate.* The legislature shall pass no bill of attainder, *ex post facto* law, or law impairing the obligation of contracts."

5. "The right of trial by jury shall remain inviolate."

6. "No person shall be debarred from prosecuting or defending any civil cause, for or against him or herself, before any tribunal in this State, by him or herself, or counsel, or both."

And lastly, these powers are excepted out of the general powers of government, forever to remain inviolate ; and all laws contrary to these reservations and prohibitions are declared void.

The Constitution then proceeds to divide the powers of government intended to be granted, into three separate departments, and to forbid either from the exercise of the powers belonging to the other. If, after this, we are to be told that the *legislature* of this State has *any right* over private property, more than any individual, except when it is taken or applied to public use upon just compensation *first* made, or in virtue of the powers conferred by the Constitution, to create inferior courts, then written constitutions are not worth the paper they have occupied ; and the freedom of the people from arbitrary despotism is but a delusion at last.

The theory of our Constitution is at war with this whole doctrine of eminent domain or pre-eminent dominion, which presupposes that the government of Mississippi has granted something, or everything, to the people ; that the State had an absolute original ownership of the whole property possessed by the individual members antecedent to their acquisition ; and that every citizen thus deriving his property from the State, upon the tacit condition and reservation that he will allow the State to take, apply, or use his property as her convenience or necessity may require ; the State may terminate or extinguish his right at her will or pleasure. This is what was anciently denominated " *eminent domain.*" Vattel, Law of Nations, p. 111, § 244. And it is just what our Constitution intended to abolish, destroy, and wholly overturn.

Hence the unqualified " declaration" that all " political power is inherent *in the people,* and all free governments are *founded on*

*their authority and established for their benefit.*"  Instead, there-
fore, of the people deriving their rights of property from the govern-
ment of Mississippi, or being in any manner its tenants upon con-
ditions express or implied, the people *made it,* what it is, from an
unorganized territory, the property of distant owners.  The *people*
gave it being : it is, therefore, the *creature and agent,* and not the
*superior and sovereign* of the people.

Neither in theory, nor in fact, do the people of this State hold
their property by grant from the State.  Hence the total absurdity
of the doctrine of eminent domain, or implied conditions, under a
supposed grant : when our Constitution declares to the contrary, as
the fundamental and unalterable law of her existence.

Such are the doctrines of republican orthodoxy held by Senator
Tracy in *Bloodgood* v. *The Mohawk and Hudson R. R. Company,*
18 Wend. 56, already cited; and such are the views expressed by
Justice Bronson, in *Taylor* v. *Porter,* 4 Hill N. Y. R. 140.  Mr.
Smith, in his Commentaries, citing this case with approbation,
§ 328, says : " In another case, the doctrine was held by Justice
Bronson, that private property could not be taken for *private* use ;
that the statutes of New York, which authorized the laying out a
private road over the lands of another, are unconstitutional.  He
discussed, in a very able manner, the constitutionality of such an
act, under our Constitution, and as to what was to be implied under
the general grant of legislative power contained in the Constitution.
*He held, under our Constitution, the legislature is not supreme ;* it
is only one of the organs of that absolute sovereignty which resides
in the whole body of the people.  We nowhere find a delegation of
power to the legislature, to take the property of one and give it to
another, either with or without compensation.  Only one clause in
the Constitution could be cited in support of the power, and that
was the first section of the first article, which declared ' the
legislative power of this State shall be vested in a Senate and
Assembly.'  He admitted that the two houses, subject only to the
qualified negative of the governor, possessed all the legislative
power of the State.  But the question presented itself,—What was
that ' legislative power,' and how far did it extend ?  He held,
that it did not reach to the life, liberty, or property of a citizen
who was not charged with a transgression of the laws, and when

the sacrifice was not demanded by a just regard for the public welfare. The security of life, liberty, and property, lay at the very foundation of the social compact.

"To say that this grant of 'legislative power' included the right to attach private property, was equivalent to saying that the people had delegated to their servants the power of defeating one of the great ends for which the government was established. Without one word of qualification in the whole instrument, he should feel great difficulty in bringing his mind to the conclusion, that the clause he then had under consideration, had clothed the legislature with despotic power. That such would be the extent of their authority, if they could take the property of one citizen and give it to another, either with or without compensation. He also held, in that case, that this question, under the then Constitution, did not necessarily turn on the section granting legislative power; but that it contained negative words, under the clause, 'No member of the State shall be disfranchised, or deprived of any of the rights or privileges secured to any citizen thereof, unless by *the law of the land*, or the judgment of his peers.' That the meaning of this section was, that no member of this State should be disfranchised, or deprived of his rights or privileges, unless the matters should be *adjudged against him, upon trial had, according to the course of the common law*. That it must be judicially ascertained that he had forfeited his privileges, or that some one else had a superior title to his property, before either of them could be taken from him. *It could not be done by legislation*."

These just views, in relation to the Constitution of New York, and the powers of the legislature under it, apply with increased stringency here, where our Constitution, embracing the same, objects, is expressed in still stronger and more guarded language.

In 3 Paige, 173, and 5 Paige, 179, Chancellor Walworth gives expression to similar views.

When the Constitution declares that the citizen shall not be deprived " of his life, liberty, or property, but *by due course of law*," it means what Magna Charta meant by " the law of the land," what the Constitution of the United States means by " due process of law." " They are," says Judge Bronson, in *Taylor* v. *Porter*, " synonymous terms ;" and so it is held in *White* v. *White*, 5 Bar-

bour, N. Y. R. 481–3. Lord Coke says, "that to judge a man in a civil or criminal case, without affording him *an opportunity of being heard*, would be against this provision in Magna Charta."

Mr. Webster says: " By the law of the land is most clearly intended, the *general* law, a law which *hears before it condemns*, which proceeds *upon inquiry*, and renders judgment *only after trial*. The meaning is, that every citizen shall hold his life, liberty, property, and immunities, under the protection of *general rules* which govern society. Everything which may pass under the form of an enactment, is not therefore to be considered as the law of the land. If this were the case, acts of attainder, bills of pains and penalties, acts of confiscation, acts reversing judgments, *and acts directly transferring one man's estate to another, legislative judgments, decrees, and forfeitures, in all possible forms*, would be the ' law of the land.' Such a strange construction would render constitutional provisions of the highest importance completely inoperative and void. The administration of justice would be an empty form, an idle ceremony, and judges would sit to execute legislative judgments and decrees, not to declare the law, and administer the justice of the country." (Argument in the Dartmouth College Case.)

Judge Bronson says of this provision, in the case of *Taylor* v. *Porter :* " The meaning of this section, then, seems to be, that no member of the State shall be disfranchised, or deprived of any of his rights or privileges, unless the matter shall be *adjudged against him, upon trial*, had according to the course of the common law. It must be ascertained *judicially* that he has *forfeited his privileges*, or that some one else has a superior title to the property he possesses, before either can be taken from him. *It cannot be done by mere legislation."*

He further says: " It will be seen that the same measure of protection against legislative encroachment is extended to life, liberty, and *property*, and if the latter can be taken without a forensic trial and judgment, there is no security for the others." See Smith's Com. 722, § 593–4.

Judge Story says: " This clause in effect affirms the right of trial according to the process and proceedings of the common law."

Chancellor Kent says : " The words, ' by the law of the land,' as used in Magna Charta, are understood to mean, ' due process of law.' " Justice Johnson, in *The Bank of Columbia* v. *Oakey*, 4 Pet. Cond. R. 443, says: " After volumes spoken and written with a view to their exposition, the good sense of mankind has at length settled down to this,—that they were intended to secure *the individual* from the *arbitrary exercise* of the powers of government, unrestrained, by the established principles of private right and distributive justice."

Judge Woodworth, in *Woodcock* v. *Burnett*, 1 Cowen, 740, says, " It is one of the great principles upon which our security depends, under a government of laws, that no person shall be *put out of his freehold* or lose his goods or chattels, unless he be duly brought to answer, or be forejudged of the same by " *due course of law.*"

Judge Tucker, in *Kenny* v. *Beverly*, 3 Hen. & Munf. 336, declares that the meaning and intention of the words is, "*that no man shall be deprived of his property without first being heard in his own defence.*"

Chief Justice Ruffin, in *Hoke* v. *Henderson*, 4 Devx. R. 15, affirms the same doctrine. And in *Brown* v. *Hummel*, 6 Barr, Penn. R. 87 ; and in *Ervin's Appeal*, 16 Penn. State R. 256, the Supreme Court of Pennsylvania most distinctly and forcibly lay down the rule as follows :

"By ' the law of the land' is meant the law of an individual case, as established in a fair open trial, *or an opportunity* given for such trial in open court, and by due process of law. Not a bill of attainder, in the shape of an act of Assembly, whereby a man's property is swept away from him without a hearing, trial, or judgment, or the opportunity of making known his rights or producing his evidence."

And, in *Ervin's case*, the same court adds : " And Lord Coke says, that the words *per legem terræ* mean, by due process of law, and being brought into court to answer according to law. If government is interdicted from taking private property for public use, even without just compensation, how can the legislature take it from one man, and dispose of it as they think fit ? The great principle is, that a man's property is his own, and that he shall enjoy it ac-

cording to his pleasure—injuring no other man—until it is proved, in due course of law, that it is not his, but belongs to another."

In *Aaron Smith* v. *Burlingame,* 4 McLean R. 498, the same principles are announced.

Mr. Blackwell, in his learned treatise upon Tax Titles, concludes his able review of the authorities on this point by saying, "It may be safely affirmed, as a principle of constitutional law, that the clause in question requires judicial, as well as legislative, action, before any person can be deprived of his life, liberty, or property." See Blackwell on Tax Titles, 35–37.

Lord Coke says, that in all statutes declaring forfeitures, "it is intended upon office found ; incidents are ever supplied by intendment." 2 Inst. 201; *Doulin's case,* 3 Coke's R. 10 ; and *Page's case,* 5 Coke R. 82. And the same doctrine was recognized in *Fairfax* v. *Hunter,* 7 Cranch, 603, 621.

Private property may be taken for public use only in one of two ways : by taxation, which becomes a debt to be enforced by "due process of law," or by just compensation first made ; and this by virtue of our Constitution. See *Thompson* v. *The Grand Gulf Railroad and Banking Company,* 3 How. Miss. R. 246 ; *The People* v. *The Mayor of Brooklyn,* 4 Comstock, 422–424.

Lord Coke says, in commenting on Magna Charta : "Law of the land means due course and process of law," . . . . "by indictment or presentment," . . . "or by original writ of the common law." Institutes, 45–50 ; Smith Const. Law, § 594, p. 723.

Mr. Blackwell, in concluding his chapter on "the *fundamental principles which control the taxing power,*" after having discussed the meaning of these phrases : "law of the land," "due course of law," and "due process of law," in the several constitutions where they appear, and using the language just quoted above, in the next paragraph thus proceeds : "Such are the securities which the people, in the exercise of their inherent powers, have provided against legislative spoliation. It will be seen that every individual has, in the Constitution, an absolute, complete, and perfect protection in the quiet use and enjoyment of his property, until it shall be *judicially ascertained* that he has violated some general law of the land, which authorizes a seizure and divestiture of his right thereto, for such violation. This is most clearly the true reading and expo-

sition of the text of the Constitution. *If, however, the require-
ments of the Constitution must yield to legislative usage in direct
violation thereof*, then of *necessity*, all legislative acts which conflict
with these great fundamental principles, should be held in their
construction and application to the most rigid scrutiny.

"In concluding this branch of the subject it may not be consi-
dered improper to make a few suggestions in relation to the consti-
tutional mode of enforcing the collection of taxes. The power to
levy a tax properly belongs to the legislative power. The collec-
tion of it involves the exercise of judicial and executive functions.

"The legislature levy the tax, direct that a demand shall be
made upon the owner of the land for the tax charged against it;
and if payment is refused, authorize the collector to seize the
body or goods of the delinquent, and if satisfaction is not had in
one or the other of these modes, power is conferred upon the col-
lector to sell and convey the land itself. Now, before the power to
sell the land can exist, under the law, the fact of the levy and non-
payment of the tax, the demand and return of no goods, or that
the body cannot be found, must exist. These facts must be ascer-
tained to exist, before the power of sale attaches. Whether the
power to decide the question of delinquency is vested, by law, in
the regularly constituted judicial tribunals, or in those specifically
instituted for that purpose, or in the collector himself, can make no
kind of difference; it is the exercise of *judicial power*, and the officer
who sells, performs a judicial function. So that, in point of fact, the
legislative, judicial, and executive departments of the government
all aid in the execution of the taxing power. The legislature declare
what facts shall constitute a cause of forfeiture; the judiciary ascer-
tain the facts, apply the rule of law prescribed, and pronounce a
judgment of condemnation. For these reasons it was suggested,
by an eminent lawyer of Illinois, who has great experience in
questions of this character, that 'no valid sale of land for the non-
payment of taxes, having the effect of divesting the owner of his
estate, can legally take place, unless each of the three great de-
partments of the government concur in the condemnation.' After
stating that, in accordance with this suggestion, the legislature of
Illinois, in 1839, passed a revenue law, conforming to these requi-
sites, and that similar statutes have been enacted in Tennessee,

Ohio, and Indiana, the author proceeds to say, 'no such power as that of selling land for the non-payment of taxes is to be found in the revealed, natural, civil, or common law. But there are analogous powers to be found in the common law code, and in the statute law of every civilized nation; for example, the power to condemn land for public uses, and in other cases where power is exercised over the estates of the citizens, such as the sale of land for the payment of the debts of the owner. In all these cases judicial proceedings intervene. The Constitution declares, that private property may be taken for public use upon making just compensation. The legislature direct the laying out of a public highway. Before the title of the owner is divested, a regular judicial inquiry takes place; the question, whether the use is a *public* one, or whether it is a mere legislative pretence, to divest the title of the owner and confer it upon a favorite, and what compensation shall be made to the owner, as an equivalent for the loss of his estate, are all inquired into, and judicially ascertained and decided, after due notice and hearing. *So in every case where the title to real or personal property is sought to be divested, under the general laws of the land, judicial proceedings always intervene.* There is no difference, in principle, between the power of taking land for public use, and the power to tax and enforce its collection by a sale of the land. In both cases the land is taken for the use of the public,—they differ only in degree. Why, then, should not the same solemn forms be pursued in the one case as in the other? The only answer is '*State necessity*, and *immemorial usage.*' The former demands, and the latter *sanctions this departure from the letter and spirit of the Constitution.*"

The author then proceeds to cite and quote from the cases furnishing *this answer*, and then adds: "Thus it will be seen that all of the cases concede, that the summary exercise of this power *is against the spirit of the Constitution*, but defend it upon the ground of *immemorial usage and State necessity*. But, to use the emphatic language of the Supreme Court of Missouri, '*This very necessity begets another necessity*, that in the execution of such a power the law shall be *strictly and punctiliously* complied with, *in all of its requirements.*'"

The author then closes the chapter by showing the distinction

between a *tax* and a *penalty* for the non-payment of taxes. However the former might be justified by " *State necessity,*" in the latter " a jury must decide upon the supposed infraction, before the penalty can be inflicted."

The concession that the summary exercise of this power, in *either case*, is against the letter or spirit of the Constitution, would be conclusive against it. We regard these provisions in the Constitution as intended to guard the rights of the people against unlimited power, nowhere more dangerous than in a popular government, and in no particulars so much needing restraint as in those embraced in the ancient doctrine of eminent domain. This whole doctrine of eminent domain had its origin in the system of feudal tenures, in England; a system of servitude and inequality, which, if it had ever had an existence in this country, would have been annihilated by the very first section of our Declaration of Rights. Mr. Kent, in his Commentaries, vol. 4, p. 137 (9th ed.), says : " The doctrine of estates upon condition, in law, is of feudal extraction, and resulted from the obligations arising out of the feudal relation. The rents and services of the feudatory were considered as conditions annexed to his fief; and, strictly construed : if the vassal was in default, by the non-payment of rent or non-performance of any feudal duty or service, the lord might resume the fief, and the rents and services were implied conditions inseparable from the estate."

It will be seen, therefore, that a doctrine originating in barbarity and plunder, by which conquering generals allotted or granted to superior officers large parcels or districts of land, and they in turn dealt them out again in smaller parcels, to inferiors, upon condition of services " free" and " base ;" a doctrine founded in the subjection of the citizen to almost absolute servitude, by special contract; a doctrine wholly opposed to the principles of personal freedom as well as the security of private property,—can have no application, either in fact or theory, to a government like ours. Property here is held by no such tenure; nor is it held of any superior. It is not derived from the State, and if it were, it could be held, under our system, upon no such conditions. The Constitution, in full view of this whole doctrine of feudal tenures and its degrading incidents, free and base services, forfeitures and villanage, and their tendency to degrade and impoverish the citizens at

the will of the sovereign or superior, at one blow overturned the whole system, by constituting every man a part of the sovereign power, establishing equality of rights, and making government the servant, instead of the master of the people.   To hold now, under such a constitution, that the citizen who labors for his money and by the arts of enlightenment and civilization purchases a tract of land of the Government of the United States by a written contract, or patent, or derivatively of its vendee or grantee, or even of the State of Mississippi itself, conveying an absolute title for a full consideration paid, without any condition expressed on its face, holds that land upon the condition annexed to every grant by the doctrine of feudal tenures, or upon any condition not expressed in the deed, or grant itself, is a doctrine belonging to the past ages,— of legal fictions and the divine right of kings, and not to this day of written constitutions, declaring the sovereignty of the people and the servitude of governments.   Indeed, even under the doctrine of feudal tenures, no such arbitrary power as that set up for the State (by *legislation alone*, to appropriate to itself the property of the citizen for non-payment of tax), existed.   Chancellor Kent says on this subject, vol. 4, p. 138 : " The remedy for breach of the condition was confined to the resumption of the estate, by the donor and his heirs, and that *resumption* was required by *the just interposition of the law*, to be by *judicial process*," and for this he cites Wright on Tenures, 196, 199, and Butler's note, 84, to Co. Litt. lib. 3.

I am not insensible of the novelty, in some respects, of the views here presented; nor of the many opinions of able and .experienced jurists, in other States, announcing different views and conclusions. It will be observed, however, that they have all been constrained to abandon the great highway of reason and argument, and at last to plant themselves upon the plea of " necessity," or this feudal right of forfeiture, founded on the false assumption of the relation of lord and tenant, or feudatory, and the right of resumption of the freehold growing out of it, for breach of the supposed conditions of an original grant, which never existed.

For my own part, with all becoming deference to the great minds, whose province it is not only to *enlighten*, by their wisdom and learning, but sometimes to *enslave*, by their authority, my reason

will not allow me to give my sanction, as a public officer, to doctrines so subversive, in my humble judgment, of the principles and theory of our republican, constitutional governments. It would be an abandonment of duty as well as reason, were I, under such circumstances, to resign my right and obligation .of independent thought and opinion, which, I may add, it is not the *least* commendation of the noble profession of the law, that it inspires, encourages, demands.

Nor am I less sensible of the weight of legislative precedents, which are invoked to sanction the exercise of the power in question. To bring the *Constitution*, however, to the test of *legislation*, instead of *legislation* to the test of the *Constitution*, *in judicial investigation*, would be to abrogate all restraint, and make the Legislature more omnipotent than Parliament. I am equally impressed with the force of the *argumentum ab inconvenienti* in doubtful cases, where great public inconvenience or damage is to result. But here, in my judgment, it is a plain conflict between constitutional right and legislative power. In such a conflict, indifference, hesitation, timidity, is judicial conspiracy against private right. I cannot therefore yield my conviction of duty to " public necessity," if such necessity existed. It is not the province of courts to *make*, but to *construe* constitutions and laws.

But, in my judgment, there is no such " necessity," no such inconvenience. A plain and ready, even summary mode, for the collection of taxes due the government, is in the power of the legislature, without resort to the extraordinary, arbitrary, and oppressive remedy of taking the land of the citizen, by mere declaration of legislative forfeiture.

The power to *levy* the tax, undoubtedly belongs to the legislature ; the *collection* involves the exercise of executive and judicial functions. For this purpose, the Constitution authorizes the legislature to create inferior courts, of special and summary jurisdiction, who give notice as directed, actual or constructive, fix the day for hearing, and decide judicially the charge of delinquency ; also, to create ministerial officers, whose business it shall be, speedily, without delay, to execute the judgments thus pronounced, by a sale of the delinquent's property. Where, then, the excuse for this claim of " *necessity ?*" That the jurisdiction to hear and deter-

mine, after notice by summons, or publication at a time specified, is vested in the tax assessor, does not make its exercise, the less a judicial power.

In this manner, the Constitution is vindicated and upheld; the "law of the land," or "due course of law," or "due process of law," observed and followed,—a law which hears before it condemns,—which proceeds upon inquiry, and renders judgment *only* after a trial.

And in this manner, no man's estate is taken from him *without notice*, by legislative judgments, decrees, and forfeitures, in the face of a written constitution to the contrary. That a different rule may have obtained in other States, under other and different systems, would not even be persuasive, as precedent, unless it were further shown that their constitutions were in all respects, on this subject, like ours; and even then I confess that, with me, the day has long since passed when such precedents are authoritative, except by the force of the reasoning they employ. I regard it as the crowning merit of legal science, that it measures its judgments by the test of reason; by established principles, having their foundation deep laid in the sanctions of the human mind and human heart, and not by the uncertain standard of a supposed "*public necessity,*" unanswerable as an argument, and illimitable as a source of power, because despotic.

The independence and searching analysis of thought it generates; the firm reliance upon reason and established principles it teaches and inspires; the just regard for the rights of the *suitor*, whether an infant or an empire, which distinguish the judgments of enlightened jurists,—have made *the law*, as a science, everywhere the companion and friend of constitutional freedom and equality, as well as the efficient agent of constitutional government.

Sanctioned and established by reason, addressing itself to the enlightened judgment and conscience, *precedent* is of universal authority and obligation as a guide for judicial action. But when extorted by a supposed "*necessity,*" to which reason and established rules are made slaves, they are only to be followed when they cannot be shunned.

Regarding the act in question as an assumption of executive and

judicial power by the legislature, divesting the defendant of his property, without "due course of law," or without "just compensation first made," by a simple act of legislation, without hearing, without inquiry, without notice, it is in my judgment in violation of our organic law, and therefore void.

It follows that the title conveyed to the plaintiff, under and by virtue of this act, is also void, and cannot therefore support his action. The judgment below, in this view, was correct, and should therefore be affirmed, in my judgment.

SMITH, C. J., concurring, the judgment was ordered to be affirmed.

HANDY, J., dissented, as follows :

Dissenting, as I do, from the opinion of the majority of the court, I will briefly state my views of the important questions therein considered.

This action was brought by the plaintiff in error to recover a tract of land in the possession of the defendant.

In support of the plaintiff's title, he offered the following evidence :

1st. A deed of conveyance from the State of Mississippi to one William W. Black, dated 18th June, 1853, for the lands in controversy ; reciting that it had been forfeited to the State for the non-payment of taxes in April, 1851, and after the expiration of the period of redemption. That Black had paid into the State Treasury the sum required to redeem the land ; and thereupon that it was conveyed to him in virtue of the provisions of the Statute of March 9th, 1850, and March 16th, 1852.

2d. A deed of conveyance of the same land executed by Black to the plaintiff, dated 10th October, 1853.

3d. A certificate of the auditor of public accounts, dated 15th April, 1857, stating that it appeared from the records of his office that the tax-collector of Chickasaw county did, on the 1st Monday of April, 1851, return to the board of police of that county a list of all the lands and town lots, within that county, delinquent for taxes, &c. ; at the foot of which return appears the oath of the tax-collector, setting forth that after diligent inquiry he could not

find personal property liable to distress for the said taxes, which oath appears to have been made according to the second section of the Act of 1850 ; and that it appears, by the records of the auditor's office, that a copy of said list so returned was certified by the probate clerk of Chickasaw county, and returned as the law directs to the auditor of public accounts, by whom the said list and verification were duly recorded in a record-book kept by him for that purpose ; and that among the lands so returned forfeited, was included the land in controversy.

To the admission of this certificate, the defendant objected, on the ground that it was insufficient in law to prove the facts recited in it ; and the objection was sustained, the plaintiff excepting.

The plaintiff then offered in evidence, in connection with this certificate, the record of the board of police of Chickasaw county, and the order on the minutes thereof, on the 2d Monday of April, 1851, directing the clerk of that board to certify a literal copy of the list of lands and town lots in said county delinquent for the non-payment of taxes thereon for the said fiscal year, to the auditor of public accounts : to the introduction of which the defendant objected, and the objection was sustained, the plaintiff excepting.

The defendant also objected to the reading of the deed from the State of Mississippi to Black, on the ground that the Statute of 1850, under which the land was returned forfeited, was unconstitutional, and the deed void; but the objection was overruled, and the defendant excepted thereto.

The verdict and judgment being for the defendant, this writ of error is prosecuted by the plaintiff. And it is agreed that the questions raised by both parties, in the court below, shall be considered and determined here.

1. The first question presented is, what was intended to be the character and contents of the certificate of the auditor authorized by the 4th section of the Act of 1850, which provides, that " in all controversies which may arise touching the delinquency and forfeiture of such lands, the certificate of the auditor, under his seal of office, shall be taken and held as evidence of the same, liable to be rebutted only by proof of such payment to the collector."

The previous sections of the act required that the tax-collector should return a list of the delinquent lands to the board of police on the first Monday of April; and on the 2d Monday of the same month, the board were required to examine the list, and to order a copy of it to be certified by their clerk to the auditor; and then it provided, that "said list and verification, when filed in the office of the auditor, shall be entered on a record," &c., . . . "and shall vest a title to the lands in the State," &c.    Then follows the provision in relation to the auditor's certificate.

This provision is, not that a *certified copy* of the list returned to the auditor's office, under his official seal, shall be evidence, but that his *certificate* shall be held and taken as evidence.    The manifest meaning of this is, that the certificate, stating that the certified copy of the list and verification returned to his office from the board of police, showing that the taxes for the particular year upon the lands specified remained unpaid, had been filed in his office in due time as required by law, and had been entered by him on a record kept for that purpose in his office.    It was a certificate of facts, and not a copy of documents, that was plainly intended; and under the construction given to this statute by this court, that certificate was evidence of the delinquency and forfeiture of the lands, unless it was shown that the essential steps, required by the statute to render the forfeiture legal and valid, had not been complied with.    *Hopkins* v. *Sandidge,* 31 Miss. 668.

The certificate of the auditor offered in evidence is in accordance with this view, and the court erred in excluding it as evidence.

2d. It is also objected that the statute authorizing such a certificate is unconstitutional, because it confers upon the auditor the power to determine the validity of the proceedings in relation to the forfeiture of the land.

This is not a judicial power vested in the auditor as is contended, but a statute regulation as to the evidence necessary to show that lands have been returned as delinquent for the payment of taxes, and have been forfeited to the State.    The certificate shows that the list and verification have been returned to the auditor's office in the form required by law, and there entered of record.    The statute, then, according to the construction given to it, gives that certificate the effect to prove, *prima facie,* that the steps required by

law in relation to the assessment of the land and the return of the delinquency to the board of police, and their action upon the subject, have been complied with. In other words, the certificate of the auditor, showing the return of the list and verification to his office, and their registration there, are made to create the presumption that the necessary precedent acts have been done, and that the forfeiture is regular; and this is the effect of the certificate as mere matter of evidence.

It is too firmly settled to admit of any doubt, that the legislature has power to change existing rules of evidence, and to prescribe new rules of evidence and of judicial procedure. And upon this principle, statutes have been passed, making deeds of officers for property sold by them at public-sales, *prima facie* evidence that the acts, necessary to the validity of the sales, had been done; and such statutes have been acted upon and sustained here and elsewhere as salutary and entirely within the legislative power. *Pillow* v. *Roberts*, 13 How. 472. There is no substantial difference in principle between these statutes and that under consideration; for they are alike but rules of evidence, prescribed by the legislature, touching the proof of certain official acts; and their effect is merely to create presumptions in favor of the performance of official duty, and which will prevail unless rebutted by proper evidence, in controversies in which the validity of the official acts may be involved.

As to the direct statements of the certificate, the policy of the statute was doubtless to simplify the mode of proving the return of delinquency and forfeiture, and its registration in the auditor's office, by providing that those facts might be proved by his certificate, instead of requiring parties to incur the expense of obtaining copies of the entire list and proceedings returned, which would be voluminous, and contain much that was irrelevant to the particular case.

This objection to the certificate is, therefore, not well founded.

3. It is insisted that the Statute of 1850, under which the forfeiture took place, is unconstitutional, because the proprietor is, under its operation, deprived of his property without *due course of law*, and in violation of the 10th section of our Bill of Rights; and, therefore, that the title of the proprietor was not affected by the forfeiture.

The cases in the various courts of this country, in which the true sense of the words, "*law of the land*," and "*due course of law*," and "*due process of law*," used in the constitutions of the States of this confederacy, has been the subject of consideration, are very numerous, and there is great diversity in the views taken in relation to their import. Many of them are cited in Blackwell on Tax Titles, 27 to 36, and are collated in the opinion of the majority of the court.

It appears that the question arose in those cases upon statutes, not of a general and public nature, operating on the whole community, but upon those of a special character affecting the rights of individuals, directly divesting one person of his property or privilege, and vesting it in another; or prejudging his right; or concluding his right by special legislative action. This latter class of cases are held to be incompatible with the protection afforded to the citizen by the provisions of the State constitutions under consideration; and, with reference to such cases, it is held that these provisions mean *the general law*, and that the citizen cannot be deprived of his life, liberty, or property, except by *the general rules of law* which govern society. So far as these decisions determine the question of the power of the legislature to pass laws affecting the life, liberty, or property of the citizen, they plainly recognize the power of the legislature—so far as the clauses of the constitutions, in which the words under consideration are employed, are involved—to pass *general laws* to operate equally upon the whole community, prescribing general duties and conduct, and modes of procedure in asserting and enforcing rights and duties.

If these expositions of the clauses in State constitutions be confined to the cases of special legislation against private and individual right, which gave rise to them, the views stated in them may not be objectionable. So considered, the cases are not decisions against the constitutionality of statutes like the one under consideration, which is plainly a public statute operating on the whole community; but they are relied on to establish the doctrine that no statute of a general character, under which rights of private property may be divested, is valid with reference to these constitutional restrictions, unless the party affected has notice and an opportunity of trial and defence according to the rules of the common law. It

is evident that they cannot be regarded as adjudications of such a question; for the statutes on which they were made, were not of a public nature, but mere special legislative edicts; and it must be supposed that the jurists who declared the rules, intended their expositions to be confined to the cases before them. But to the extent to which they are here attempted to be applied, the rule declared is manifestly unsound on principle and authority.

It cannot for a moment be maintained that the clause of the Constitution intended that there should be *a suit* and *trial*, according to *the course of the common law*, in order to deprive a man of his liberty or property; for that would require *a trial by jury* in all cases, and would render void all fines and imprisonments for contempt, all proceedings by distress for rent, all decrees in chancery, and all proceedings *in rem*, which are every day practised in our courts. And yet, if it be established that this clause requires notice, trial, and judgment, as indispensable in order to subject property to sale or forfeiture for taxes, it would be difficult to avoid the conclusion that the party affected would be entitled to trial by jury. For who has the right to restrict the party of this high privilege, existing by the course of the common law, as a protection to his property, if the right to require that any formalities shall be complied with in order to divest him of his property, be considered as embraced within the general words under consideration? But if the words do not mean that, they must mean *such course or process of law as may be provided by general acts of the legislature, regulating the modes of proceeding in enforcing rights, and not obnoxious to other parts of the Constitution.*

The terms, "law of the land," and "due course of law," are generally admitted to be of the same import; and, in the language of Mr. Webster, in his argument in the Dartmouth College case, "their meaning is, that every citizen shall hold his life, liberty, property, and immunities, under the protection of *general rules which govern society*," and not subject to "acts of attainder, bills of pains and penalties, acts of confiscation, acts reversing judgments, and acts directly transferring one man's estate to another; legislative judgments, decrees, and forfeitures," and such like acts, which are of the character of legislative edicts, and not of general rules prescribing the duties, and regulating the conduct and rights

of the citizen.   It is acts of this absolute and arbitrary character against which the citizen was intended to be protected.   But the *general and public laws of the land* are within the especial province of the legislature,—the enactment of general rules prescribing duties public and private,—the modes of proceeding in fixing and enforcing rights,—and the whole subject of the forms of remedies and process. And this power can never be said to be exercised without authority, except when such special acts in derogation of private right as those above enumerated, or when public acts of a general nature, but obnoxious to other provisions of the Constitution, are passed.   If this were not true, there could never be an amendment or a repeal of a statute, touching the process and proceedings, the remedy or the evidence, in judicial proceedings, which might be found necessary or proper by experience, and the improvements in science, and by the changes in society.   "Due course of law," therefore, must mean, *such rules of action in relation to the rights and duties of the citizen, and such forms and modes of legal proceedings, of a general character, to ascertain and enforce duties, rights, and remedies, as the legislature may deem fit, and which are not forbidden by the language or the spirit of other parts of the Constitution.*

The doctrine is too firmly settled to be now called in question, that the legislature has power to change remedies and to establish new ones, subject only to the provisions of the Constitution restricting the exercise of the power.   It is also undeniable, that the State has the power, in some way, to subject the property within its limits to the payment of taxes.   How, then, is that power to be exercised, and what remedy may be instituted against the delinquent proprietor ?   The remedy must necessarily be sure and summary, for the subsistence of civil government depends upon it.

The common law *inquest of office* is unknown to our laws, except in certain cases of analogous proceedings specially provided by statute ;   and the remedy of ordinary suit, by notice, trial, and judgment, would be altogether inadequate ; for, if the collection of revenue depended upon that, it is manifest that such would be the delays in the proceeding, that the wheels of government would be stopped, and the body politic would be in a state of anarchy.   If it be necessary, under the limitations of the Constitution, to proceed only upon notice, trial, and judgment, in collecting revenues, and

any summary mode of proceeding be allowable, yet subject to these fundamental requisites in order to a valid condemnation of property to pay taxes, such a proceeding would, under the view of the Constitution contended for, be liable to similar delay and embarrassment as in ordinary suits; for in such cases, the party has a right under the Constitution to be heard by himself or counsel, to a trial by jury, and to continuances until he could be prepared for trial; and if a judgment be indispensable, he would be entitled to an appeal or a writ of error. All this is a part of the due and ordinary course of law, to which the party would have a vested right under the view of the Constitution contended for. If he has not that right, the pretence of a proceeding "by due course of law" is illusory, and he is deprived of his constitutional right; and if he has it, the delays incident to such litigation would frustrate the speedy and certain collection of the revenue. And if the view contended for be correct, no summary proceeding could be devised which would meet the public exigencies, and yet not deprive the tax-payer of his constitutional right to contest the judgment in the courts of the State by "due course of law."

The *inquest of office* at common law was but a remedy; and if we say that it is a mode of proceeding coming within the language of the clause of the Constitution under consideration, because existing at common law, for much stronger reason must it be admitted that the summary remedy of sale or forfeiture of land for taxes is not within the prohibition of the clause; because it was a remedy by statute, well established and in practice at the time of the adoption of the Constitution. And it will scarcely be denied that the legislature has the power to abrogate common law remedies and modes of proceeding, and to establish new ones, except so far as that power is restricted by other limitations of the Constitution than the one in question. For this power has never been controverted.

A summary and absolute mode of collection is, therefore, *a matter of necessity* to the subsistence of civil government. Such modes of collection of the revenues have always existed in all civil governments, and must continue to exist, under such public laws as the legislature may consider requisite to insure the certain and prompt supply of the means necessary to sustain the government; and the power is of the same category as that by which private property is

taken for public use.    It is founded *in necessity*,—the reason upon which all infringements of the natural rights of individuals are founded and justified, and, indeed, upon which all government rests.

The right of the sovereign power to collect taxes stands upon higher ground than the debt of a mere individual against the owner of the property.    The sovereign political power is the representative of the aggregate mass of the community,—the political being, by which the civil rights and liberties of the individual member of the community are protected and defended.    Without it there could be no civil government.    It is the mode and form in which the individuals composing the body politic have agreed that the rights and interests of all its members shall be regulated and determined, for the good of the associated community; and this is the *government—the sovereign political power—the State*.    The natural right of the individual member is surrendered by this power, except so far as the government may be restrained by the limitations of the compact.    As the sovereign political power is the agent to whom the good of the community is intrusted, and the common representative of the whole community, the greatest and highest earthly duty of the citizen is to support that power and to yield to its rightful authority.    Hence, his life, liberty, and property must always be surrendered for the public good, whenever legitimately demanded for the purposes of the compact and according to its terms.    This is simply the theory of all civil government as founded in the social compact; and it is the principle upon which the written constitutions of the States of this confederacy are founded, the distinguishing feature in them being that they contain defined restrictions and limitations upon the action of the government, as reservations and safeguards to the natural and individual rights of the citizen.    But it has never been maintained that the right of eminent domain did not pertain to the States of this confederacy, subject to the restrictions of their constitutions; for the right of eminent domain pertains to all civil governments, and derives its force from the very nature and objects of civil government.    This is fully recognized in our State constitutions, specifying the limitations upon the right; and the very exceptions to it which they contain prove the rule; for if the general power was not recognized as existing, it would be useless to specify exceptions and limitations to its exercise.

It is, therefore, not a mere debt which the citizen owes the commonwealth, to pay taxes for his person and property, but a high public duty to render his proportion to the exigencies of the government, of which he is a constituent part. Holding his rights of person and of property under the protection of that government, to the support of which he has become bound by the most sacred obligations, the government has a claim, as upon trust, upon the property committed to its care, and holds it in pledge for the performance of the duties of the citizen. It is well said by the Supreme Court of Georgia, in *Parham* v. *The Justices of Decatur County*, that "the sovereign right to lay and collect taxes grows out of the paramount necessities of government,—an *urgent necessity which admits no property in the citizen whilst it remains unsatisfied*. The right to tax is coeval with all government,—it springs out of the organization of the government. All property is a pledge to pay the necessary expenses of the government." 9 Ga. Rep. 352.

Upon the same reason, the cases sustaining the validity of forfeitures and sales of property for unpaid taxes, recognize the principle, that the owner holds the property upon the implied condition that he will pay to the State his proportion of what may be necessary for the support of government; and upon failure, that the property shall be forfeited to the commonwealth. Blackwell, Tax Tit. 537; *Beard* v. *Smith*, 6 Monroe, 430.

Such being the rights, duties, and relations of the citizen and the commonwealth, the legislature have the undoubted power to make provision by general laws for the prompt and certain supply of the means necessary for the support of government; and a high duty arises, to make such regulations as will answer so great an emergency. The framers of the Constitution cannot be supposed to have been unmindful of this high necessity. Summary and absolute modes of collecting the revenues have always existed, and were in force when the Constitution was framed; and the necessity demanding them cannot be presumed to have been disregarded in its formation.

In ascertaining whether a right to require a particular mode of proceeding is secured by a clause of the Constitution couched in general and doubtful terms, we must expound it with reference to the law upon the subject as it stood when the Constitution was

framed; and general and indefinite words will not be construed to change or abolish the existing mode, unless the words, aided by the entire context, clearly indicate such an intention; because it is presumed, if a change had been intended, it would have been plainly expressed.

It is in the last degree unreasonable to suppose that any of the general provisions of the Constitution were intended so to operate upon an existing remedy,—upon the prompt exercise of which, the functions of the government might directly depend,—as to cause the action of the government to cease for want of the means to carry it on.   Such a construction is not to be indulged, unless the language were so clear that it could not be avoided.

Considering, therefore, the universality of the collection of taxes in a summary mode at the time of the formation of the Constitution, and its absolute necessity for the support of government, it is very clear that the clause under consideration did not contemplate the action of government in relation to revenue, or intend to interfere with the exercise of that power, or to restrict the established summary and absolute mode of collection; for that would be to give to general and doubtful words of the Constitution, a construction tending to suspend the functions of government for want of the means to support it.

The right to pass general laws of this nature, for the absolute and summary collection of the revenue, cannot, therefore, be considered as within the contemplation of this clause of the Constitution; and the moment it is granted that the legislature has power to pass such laws, the whole power is yielded, and its exercise is a mere matter of expediency; for summary and absolute remedies, in such cases, cannot, according to the view of the clause contended for, be made consistent with the right of the citizen to be proceeded against by "due course of law."

This view is amply sustained by the adjudications in the several States, upon provisions of their constitutions equivalent to our own, whenever the question appears to have been presented for decision, whether statutes of the character of that involved in this case are within the prohibition of clauses in their constitutions of the same import as our own.

In *The State* v. *Allen,* 2 McCord, 55, Mr. Justice Nott,—after

stating many cases which must be considered as exceptions to the rule entitling a party to the benefit of a trial according to the "law of the land," including distresses for rent and for taxes, because such cases were conducted by well-known summary proceedings other than the ordinary due course of law or trial by jury, and must, therefore, be presumed not to have been intended to be changed,—says: "This method of collecting taxes is as well established by custom and usage as any principle of the common law. A similar practice prevailed in all the Colonies from the first dawn of their existence; it has been continued by all the States since their independence, and had existed in England from time immemorial. Indeed it is necessary to the existence of every government, and is based upon the principle of self-preservation." . . . "I think, therefore, that any legal process,—which was originally founded in necessity, has been consecrated by time, and approved and acquiesced in by universal consent,—must be an exception to the right of trial by jury, and is embraced in the alternative, 'the law of the land.' Such I consider to be the summary proceeding allowed in the collection of taxes."

In *McCarroll* v. *Weeks*, 2 Tenn. R. 215, the Supreme Court of Tennessee hold the following language, in sustaining the constitutionalty of their summary tax laws: "It is certainly true that they have the character of summary proceedings, and it is equally true that *they must of necessity be so;* for if the government were necessitated to take the cautious and tedious steps of the common law, in giving personal notice, making up regular pleadings, and having a trial by jury, judgment, and execution, it would cease to exist for want of money to carry on its necessary operations; loss of credit and a total extinction of the national faith, the basis of all regular governments, must be the inevitable consequence."

In *Harris* v. *Wood*, the Court of Appeals of Kentucky say: "Taxes were always recoverable before the adoption of the Constitution, not only without a jury, but even without a judge, and the assessment of ministerial officers has been made to operate as an execution on the citizen, and the collector could distrain;" and such laws are held to be constitutional. 6 Monroe, 643.

The Supreme Court of Georgia, in a recent case, have very lucidly stated the principles which govern this question. "The power,"—

says Mr. Justice Nesbit, in delivering the opinion of the court, and speaking of the validity of the summary laws for the sale or forfeiture of lands for unpaid taxes,—"in short, is the power of sovereignty, placed by the law in the hands of the State's agent, to be by him executed through the agency of the process of seizure and sale,—the power of compelling the citizen to perform a duty, which is the very first obligation of citizenship, which is indispensable to the very existence of the government, and to the enjoyment of his rights under the government, to wit, the duty of contributing his proportion of the public revenue. Neither the power nor the mode of exercising it, is unknown to the common law or new in our own State." . . . . " This process," he continues, " is not founded on a judgment; it issues without a judgment, and *it is for this very reason that it is adopted.* The State cannot wait the tedious process of getting a judgment. If she were compelled to do this, her honor might be compromitted, and the rights of her citizens jeoparded. Hence she clothes her collecting agent with the power to issue a process at once, which will *at once* command her means." . . . " The tax falls under the common law designation of *a duty.* It is not a debt due by contract, in a legal sense of contract; but the payment of taxes is a duty which the citizen owes to the State. He is not to be considered as owning property so long as it remains undischarged. It precedes and overrides all the obligations which grow out of contracts; it cannot be susperseded by *liens; it is one of those deeply laid foundations upon which governmental structure rests."* 11 Georgia, 82, 86.

The same conclusion is held in 6 Missouri, 64; *Berger* v. *Clarkson*, 1 Halstead, 352, and in *City of New Orleans* v. *Cannon*, 10 La. (annual), 764.

In stating the law, as settled in this country, Mr. Sedgwick, in his work on Statutory and Constitutional Law, says, in relation to statutory enactments for the summary sale or forfeiture of lands for taxes: "The proceedings contemplated by these enactments are generally directed to be taken without giving the party alleged to be in default any opportunity of defence, and their validity has been denied on the ground of their being in conflict, as has been urged, with the constitutional provision, which in most, if not all, of the States, guarantees to every citizen the protection of the law of the

land.   This objection has, however, been overruled, and the power has been sustained, on the ground of immemorial usage and State necessity."   352.

Mr. Blackwell,—a strenuous advocate of rigid construction and constitutional restriction in favor of the owner of property,—states the reason why the forms required for taking land for public use, are not required, in case of the sale of land for taxes, to be,—state necessity and immemorial usage; and says: " *The former demands and the latter sanctions this departure from the letter and spirit of the Constitution.*"   But he states that as the settled law.   Blackwell, 39.

The basis proposition on which the statute in question is alleged to be unconstitutional, is that it is within the inhibition of the clause of the Constitution under·consideration.   And if any question can be considered as settled by judicial decisions, and fortified by reason and sound principle, it must be that this clause of the Constitution does not embrace tax sales or forfeitures for taxes; and it follows, that full power over the subject remains with the law-making power, subject only to other provisions of the Constitution restricting that power; and it is not pretended that any other provisions deny the power.

Unless, therefore, we disregard all principle, and turn a deaf ear to all authority, as well as to the conservative rules by which government must be maintained, it seems to me impossible to hold laws of this character void for the violation of any guarantee to the citizen contained in the Constitution; for such a construction would involve the absurdity of an effort *to maintain the Constitution by prostrating the government which it created,*—to *preserve its vitality, by depriving it of the means of subsistence.*

It appears never to have been held in this country, in any of the cases that have arisen under statutes declaring lands forfeited for non-payment of taxes, and vesting the title in the commonwealth in consequence thereof, or providing that they should be summarily sold for the non-payment of taxes, that the legislature had not the power to pass such statutes.   Some of the cases hold that it is necessary that there should be an *inquest of office* before the title of the delinquent tax-payer or proprietor can be divested, and that the rule of the common law in relation to *inquests of office* is ap-

VOL. IX.—30

plicable to such cases. Of this character are the cases of *Robinson*
v. *Huff*, 3 Littell, 38, and *Barbour* v. *Nelson*, 1 Littell, 60. But
these cases proceed upon the ground that the common law proceed-
ing of *inquest of office* is not abrogated by statute, and that the
statute does not provide that the title shall vest in the State, or be
divested from the proprietor, without an *inquest of office*. But it
is fully admitted, that it is competent for the legislature to change
the common law rule, and to provide that the title shall be vested
in the State by the return of the officer, or by the record of the
forfeiture made in the proper office. In the case of *Kinney* v.
*Beverly*, 2 Hen. & Munf. 344, that power is fully sustained.
But in the opinion of Tucker, J. (which was not concurred in by
the court), the doctrine is advanced, that in order to divest the title
of the proprietor by operation of a statute, providing that the land
shall be forfeited and vested in the commonwealth, in case of delin-
quency in paying taxes, it should be done " by an inquest of office,
*or by some other mode to be provided by the legislature*, whereby
the certainty of the lands may be shown, and the seisin as well as
the right vested in the commonwealth;" and he adverts to an addi-
tional reason, that by the principles of the Constitution, no man
should be deprived of his property without being first heard in his
defence. This is the only case which I have been able to find,
containing any intimation of an opinion against the constitutionalty
of laws like the one under consideration. The opinion does not
appear to be stated with confidence by the judge who delivered it,
with respect to the question involved in this case ; and, at all events,
it is not the opinion of the court. Its reasoning is meagre and
unsatisfactory, and it certainly cannot prevail over the clear views
and strong reasoning of the cases above cited, holding a contrary
opinion. In subsequent cases in Virginia, the rule here stated is
fully sustained. 10 Grattan, 400 ; Ib. 405 ; Ib. 418.

But if the provision of the Constitution referred to can be ap-
plicable to the question of the collection of taxes by the summary
proceedings necessary to render the collection adequate to the
emergencies of the State, is the mode of forfeiture provided by the
Statute of 1850 liable to the objection of being without " due
course of law ?"

This statute is a public law, operating alike upon all the citizens

and property-holders of the State. It provides a remedy for the collection of delinquent taxes,—prescribing in what manner a forfeiture of the land of the delinquent shall be consummated,—by the return of the tax-collector, *at a fixed time*, to the board of police, by whom the return is, *at a specified time*, to be examined, sanctioned, and recorded, and then to be transmitted to the office of the auditor of police accounts at the seat of government, where also the proceedings are to be recorded,—changing the common law proceeding of *inquest of office*, by establishing a new mode of vesting the lands in the State, as it was entirely competent for the legislature to do, and giving to the proprietor reasonable time for redemption. Thus a remedy, deemed by the legislature fit and proper for the exigencies of the State, is established by law, to be enforced in a prescribed form, under the sanction of the board of police, the judicial tribunal to whose jurisdiction the subject-matter is committed by the Constitution,—to be enforced at a stated time fixed by the act, and of which the tax-payer should take notice, and in a manner calculated to work no prejudice to the good and faithful citizen.

It has always been held that statutes authorizing sales by collectors or other ministerial officers, for delinquent taxes, upon notice given by posting or by publication in a newspaper, are within the powers of the legislature; because notice in law was given to the delinquent by the posting or publication. This mode of proceeding, though summary and harsh, has never been held to be unconstitutional, though fully obnoxious to the force of the objection here urged. But it is manifest that the mode of proceeding prescribed by the statute under consideration is much less oppressive upon the tax-payer than such summary sales. For this statute gives notice to the party in the most certain and public form that can be, by fixing a certain day when the return of delinquency shall be made to the board of police, and also a day when that tribunal is to take its final action in the matter. These times are fixed by law, thereby giving the fullest notice, and enabling every man to attend by himself or agent and examine whether his land is returned as delinquent. The same rule is observed in the present statute, requiring that the tax-collector shall make sales of such property at a regular and fixed time. But the time of sale fixed by the col-

lector or other officer under the statutes above adverted to, is uncertain, depending upon his discretion, and notice of it may never come to the actual knowledge of the tax-payer. Suppose the taxpayer to be a non-resident, and that he has actually paid his taxes on the land, which mode of notice is the better calculated to apprise him of the fact that his land is about to be sold as forfeited upon a claim of unpaid taxes ? Certainly the notice provided by this statute fixing the time when his land will be declared forfeited. For he cannot fail to know that, and to be enabled to prevent the loss of his property : whereas, in the other case, the time of sale is fixed at the discretion of the officer, and it depends upon the uncertain and improbable thing of his receiving actual notice of the posting or publication, and in due time, whether he can save his property from sale. Assuredly such a mode of proceeding is much more inconvenient and oppressive to the tax-payer than one which is fixed as to time by the positive provisions of the statute ; and yet sales made upon such notices under the authority of statutes have been universally upheld so far as the power of the legislature to establish such modes of proceeding is concerned.

There is, therefore, no difference, as to the legislative power, between the modes prescribed by these two kinds of statutes ; and as to their practical operation, the statute here in question is much more favorable and beneficial to the tax-payer than those which leave the time of sales to the discretion of the officer. The only difference in principle between them, is that one is a *forfeiture*, and the other *a sale ;* a difference merely in form and expression ; for a sale under such a statute is in effect nothing but a forfeiture. Blackwell, 39, 537.

The mode of proceeding prescribed by this statute appears, therefore, to be plainly " in due course of law," and as well calculated to enable the property-holder to protect his property against forfeiture, as the exigency of the case would justify. And if such a proceeding be not constitutional, it must be, not because it is unjust or oppressive upon the tax-payer, or because he has not had *ample notice* and *opportunity to protect his rights,* by performing his duty as a good citizen in paying the taxes ; or in case of error, *to appear before the board of police at the time appointed by law* and have it corrected ; but because the Constitution prohibits the State

from passing *any* laws for the summary collection of her revenues; a doctrine not sanctioned by authority, unfounded in sound principle, and suicidal of government.

For these reasons, I am of opinion that the Statute of 1850 is a valid and constitutional law.

And upon the grounds of error relied on by the plaintiff in error, I think that the judgment is erroneous, and should be reversed.